UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEWS, et al.,

        Plaintiffs,

v.

ALC PARTNER, Inc.,

        Defendants.

_____/

Case No. 2:08-cv-10636

HONORABLE STEPHEN J. MURPHY, III

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

The plaintiffs in this litigation are current and former employees of the defendants ALC Partner, Inc. and ALC Acquisition Company LLC. ALC Partner, Inc. owned and operated a nationwide chain of hair-removal clinics known as "American Laser Centers" until 2007, when the chain was purchased by ALC Acquisition Company LLC, which continued its operations. Defendant Richard Morgan is the founder of American Laser Centers, and until the 2007 sale was its President and CEO. Collectively, the defendants will be referred to as "ALC."

This action arises out of ALC's alleged failure to comply with provisions of federal and state law with respect to the compensation and benefits provided to its employees. Mainly, however, the plaintiffs make two claims: first, that during their employment ALC required them to work extra hours without pay, and second, that they were entitled to overtime (often as a result of these unpaid extra hours), for which ALC also did not pay. One group of plaintiffs adds a claim by asserting that ALC improperly treated them as exempt from

overtime wages, and thus improperly paid them nothing extra for the hours they worked in excess of 40 per week. All plaintiffs additionally claim that ALC wrongfully treated their retirement-plan accounts as if these extra hours of work did not exist.

The complaint alleges nine counts. Count One claims that ALC did not maintain records (of the plaintiffs' unpaid hours) with respect to its employee retirement plan, as required by the Employee Retirement Income Security Act, 29 U.S.C. § 1059(a) ("ERISA"). Count Two alleges that ALC violated its fiduciary duties of loyalty and care under ERISA, 29 U.S.C. § 1104(a), by failing to credit eligible compensation under their retirement plan. Both Counts One and Two purport to be nationwide class actions. Count Three alleges that ALC willfully violated two different requirements of the Fair Labor Standards Act ("the FLSA"): that of 29 U.S.C. §§ 207(a)(1) and 215(a), which requires extra pay for overtime work; and that of 29 U.S.C. §§ 211(c) and 215(a), which required the keeping of certain employment record. Count Three purports to be a nationwide opt-in collective action under the FLSA. Counts Four through Seven allege that ALC violated various provisions of the laws of Arizona, Illinois, Pennsylvania, and Utah, by failing to pay overtime and/or minimum wages, failing to keep proper records, making improper deductions from employee wages, failing to provide lunch breaks, and failing to pay all compensation owing within the legally-specified time periods after the employee separated from the company. Each of these counts purports to be a class action under the laws of the individual states. Counts Eight and Nine, apparently predicated on the same facts, are, respectively, claims for conversion and unjust enrichment, based on the common law of each of those states.

Currently before the Court is ALC's motion to dismiss all nine counts of the complaint, filed pursuant to Federal Rule of Civil Procedure 12(b)(6), for the plaintiffs' failure to state

claims on which relief can be granted.  Docket no. 6.  The Court will consider each count separately.

BACKGROUND and ANALYSIS

I.  The Legal Standard

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . .  be exposed at the point of minimum expenditure of time and money by the parties and the court.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, ___; 127 S. Ct. 1955, 1966 (2007) (citations omitted).  Accordingly, Federal Rule of Civil Procedure 12(b)(6) allows a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true.  *See Minger v. Green*, 239 F.3d 793, 797 (6th Cir. 2001) (citations omitted).

In assessing a motion brought pursuant to Rule 12(b)(6), the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party.  *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  To determine whether the plaintiffs have stated a claim, the Court will examine the complaint and any written instruments that are attached as exhibits to the pleading. Fed. R. Civ. P. 12(b)(6) & 10(c).  Although the pleading standard is liberal, bald assertions and conclusions of law will not enable a complaint to survive a motion pursuant to Rule 12(b)(6). *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).  The Court will not presume the truthfulness of any legal conclusion, opinion, or deduction, even if it is couched as a factual allegation.  *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

The Federal Rules of Civil Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). This standard requires the claimant only to put forth "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the requisite elements of the claim]." *Bell Atlantic*, 127 S. Ct. at 1965. Thus, although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. Sept. 25, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, ___; 127 S. Ct. 1955, 1965 (2007)). Therefore, the Court will grant a motion for dismissal pursuant to Rule 12(b)(6) only in cases when there are simply not "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*; 127 S. Ct. at 1974.

*   *   *

Here, the better part of ALC's motion consists of arguments that under *Bell Atlantic*, the complaint simply does not include enough detail. Although the Court will elaborate on these arguments below in considering the viability of each of plaintiffs' claims, it is worth stating at the outset that for the most part, ALC's argument would be valid only if *Bell Atlantic* required more than it actually does. With respect to one count of the complaint after another, the defendants argue that plaintiffs have not provided enough details in support of their claim, and have not alleged sufficient facts to raise their pleading above a conclusory level. But with few exceptions, the plaintiffs have certainly pleaded a facially

plausible claim, *id.*, so as to create a reasonable expectation that their allegations can be substantiated through discovery, *id.* at 1965. If defendants' version of "notice pleading" were required, the length of the complaint in this and every moderately large class action would balloon to many hundreds of pages, and the Court finds no reason to require it here.

Speaking generally, the plaintiffs have alleged that they were or are employees of ALC, and that "as a means of reducing their labor costs, Defendants' policies and compensation plan were designed to prevent or minimize the wages, overtime compensation, and other monies required to be paid or credited to its [sic] employees." Compl. ¶ 20. As will become clear on closer examination, the facts pleaded in support of these allegations are neither speculative nor conclusory.

## II. Facts

Although the plaintiffs allege that ALC has violated a panoply of different statutory and common-law rules, the facts on which they base these claims are relatively straightforward. Basically, the plaintiffs level two interrelated types of complaints. First, they claim that ALC failed to pay them, or to credit their 401(k) plans, for all the hours they worked each week, typically by demanding unpaid overtime or working lunches. Second, a subset of plaintiffs claims that ALC attempted to justify this by improperly classifying them as salaried "managers" who were exempt from federal minimum-wage requirements under 29 U.S.C. § 213(a)(1).

## III. ERISA Claims

A.  Count One: Failure to Keep Records

The purported ERISA class action is brought on behalf of all employees during the relevant time period "who were, are, or will be employed by ALC nationwide [and] were, are, or will be covered by ALC's 401(k) or Roth 401(k) retirement savings plan."   Compl. ¶ 15.  The Complaint alleges that ALC was their "employer" within the meaning of ERISA. *Id.* ¶ 105.  "Pursuant to the terms of the Retirement Plan, employees' rights to share in the contributions to the Plan are dependent, in part, on their Eligible Compensation, which includes, among other things, employees' wages and overtime compensation."  *Id.* ¶ 110. But "ALC has . . . failed to keep records of the ERISA Named Plaintiffs' and the ERISA Class members' hours and overtime work."  *Id.* ¶ 32.  This, allege the plaintiffs, was a violation of ERISA, as codified at 29 U.S.C. § 1059(a)(1), which requires that "every employer shall, in accordance with regulations prescribed by the Secretary, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees."

The defendants object that the Complaint's unadorned allegation that ALC was their employer within the meaning of ERISA "is exactly the conclusory allegation that *Bell Atlantic* held insufficient."  Def. brief, docket no. 6, at p. 6.  ERISA defines an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."  29 U.S.C. § 1002(5).  In light of this circular definition, it is difficult to know what further detail could be expected.  Even so, the Complaint is replete with allegations that the plaintiffs performed duties for ALC, *e.g.,* Compl. at ¶¶ 7-8, 18, and that ALC directed their actions in detail, *e.g., id.* at ¶¶ 18, 19.

These allegations therefore amount to proper allegations that ALC was the plaintiffs' "employer."

The defendants also complain that "Plaintiffs fail to plead any facts or identify any regulation under 29 U.S.C. § 1059 which required ALC to keep certain records . . . . Plaintiffs fail to plead basic facts such as what records were required to be kept, how they relate to the determination of ERISA retirement benefits, or what specific injunctive relief is being sought." Def. brief, docket no. 6, at p. 6. Defendants provide no authority in support of their argued requirement that the complaint refer to specific regulations they have violated. By referencing 29 U.S.C. § 1059(a)(1), however, the plaintiffs have provided clear notice of the types of records they allege were not kept. Further, ¶ 110 of the Complaint states that employee retirement benefits depend in part on employee compensation. The gravamen of the Complaint is thus clear: the defendants must keep whatever records are required to compute benefits under the plan, and the plaintiffs seek an injunction requiring them to do so.

In sum, the pleadings in support of Count One raise the claims beyond the conclusory or speculative and dismissal is accordingly not warranted.[1]

B. Count Two: Breach of ERISA Fiduciary Duties

---

[1] The plaintiffs have also claimed that ALC's failure to keep records violated the laws of Arizona, Illinois, Utah, and Pennsylvania, and defendants make a similar argument as to the insufficient detail of those allegations. The Court denies the defendants' argument for the same reasons given above.

The defendants claim that Count Two of the Complaint fails both because it does not state facts with sufficient particularity and because it is based on a legally insufficient theory of liability.

### 1. Particularity

ERISA, as codified at 29 U.S.C. § 1104(a)(1), requires that

"a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and–
   (A) for the exclusive purpose of:
      (i) providing benefits to participants and their beneficiaries; and
      (ii) . . .
   (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims".

The Complaint alleges that by not crediting to the retirement plan all the wages and overtime rightfully earned by the plaintiffs, ALC breached these duties of loyalty and care. Compl. ¶¶ 33, 118.

Defendants state that because plaintiffs have not cited to a plan provision creating fiduciary duties, and have not specified what fiduciary acts defendants undertook, they have failed to state their claim with the requisite particularity. ERISA, at 29 U.S.C. § 1002(21)(A), provides that

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Plaintiffs have pleaded that "the governing instrument of the Retirement Plan confers on Defendant discretionary authority, responsibility, and/or control with respect to the crediting of compensation," Compl. ¶ 116, and that "Defendant has exercised actual discretionary authority, responsibility, and/or control in determining what compensation would and would not be credited as Eligible Compensation under the Retirement Plan," *id.* ¶ 117.   The defendants argue in essence that a specific quotation from the plan documents, or a recitation of specific fiduciary decisions they have made is necessary to survive a rule 12(b)(6) motion in this case.  But the Court finds that notice pleading does not require this sort of detail.  The plaintiffs have pleaded that their retirement plan made their employer, ALC, a fiduciary with respect to crediting hours, and that  it actually made such decisions. These claims are entirely plausible and non-speculative, as required by *Bell Atlantic*. Dismissal of Count Two is therefore not warranted on these grounds.

        2.  Legal Sufficiency

            a.  Plan Crediting as a Fiduciary Role

ALC also claims that the role the plaintiffs allege it played in deciding whether to credit overtime hours was not a fiduciary function, but instead an ordinary business activity which cannot give rise to ERISA fiduciary liability.  This argument merits careful consideration.

ERISA does not require an employer who also happens to be a plan fiduciary to run its entire business for the sole benefit of its employees. As noted earlier, the statute imposes fiduciary duties only "to the extent" that a defendant exercises discretion in managing or administering the plan or its assets.  29 U.S.C. § 1002(21)(A).  Thus, the courts have distinguished between such an employer's fiduciary capacities (the exercise of which is governed by ERISA) and its non-fiduciary capacities (to which ERISA duties do

not apply.)  Under this approach, "[e]mployers . . . can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers (e.g., firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (e.g., modifying the terms of a plan as allowed by ERISA to provide less generous benefits)." *Pegram v. Herdich*, 530 U.S. 211, 255 (2000).  "ERISA does require, however, that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."  *Id.*

In this case, there appears to be no dispute that ALC's decisions as to whether to *pay* wages and overtime were not fiduciary acts under ERISA; those decisions had nothing to do with plan management or administration.  The question, then, is whether a legal distinction can be drawn between the decision not to pay those wages and the decision not to *credit* them to the plaintiffs for retirement plan purposes, so that ALC could be found to have been wearing its fiduciary "hat" while doing the latter but not the former.

Several district courts have considered the question, and they are split on the answer to it.   In *Ballaris v. Wacker Siltronic Corp.*, No. Civ.00-1627-KI, 2002 WL 926272 (D. Or. Feb. 7, 2002), *rev'd in part on other grounds*, 370 F. 3d 901 (9th Cir. 2004), the court declined to draw a distinction, finding that an employer's failure to credit "off the clock" work was reducible to a "decision concerning whether to pay wages," and thus not a fiduciary act.  *Id.* at *2.  In *Veliz v. Cintas Corp.*, No. C 03-1180 SBA, 2003 WL 23857822 (N.D. Cal. Nov. 4, 2003), the plaintiffs claimed that their employer improperly denied them overtime by classifying them as non-hourly workers, again much as the plaintiffs have done here. The court concluded that "a bright line between ERISA plan decisions and business

10

decisions" was necessary, *id.* at *5, and that such a misclassification was more like an "act[] that an entity makes as an employer," and not as a fiduciary. *Id.*

More recently, in *Maranda v. Gp. Health Plan*, Civil No. 07-4655, 2008 WL 2139584 (D. Minn. May 20, 2008), the District of Minnesota relied on the language of the plan to reach a similar conclusion.  Specifically, the 401(k) plan in that case permitted certain employees to contribute into the plan a percentage of "the total of all compensation paid" by the employer.  *Id.* at *1.  The court noted that under this language, "[e]ligible earnings do not include compensation that *should* have been paid," and held that a misclassification of the employees as exempt from overtime thus did not amount to a breach of ERISA fiduciary duty.  *Id.* at *2.  Again, in *Lepage v. Blue Cross & Blue Shield of Minn.*, Civ. No. 08-584, 2008 WL 2570815 (D. Minn. June 25, 2008), the court was faced with a nearly identical plan provision, and came to the same conclusion – that because "the 401(k) Plan only requires that participants be credited for compensation that was *actually paid* to them," the defendant "followed the terms of the Plan when it did not make contributions based up on overtime hours for which Plaintiffs received no actual compensation."  *Id.* at *6.  This past summer, in *Steavens v. Elec. Data Systems Corp.*, No. 07-14536, 3008 WL 3540070 (E.D. Mich. Aug. 12, 2008), a judge in this District came to a similar conclusion, where the plans at issue made "earnings actually paid" or "total earnings prior to withholding" the relevant figures.  *Id.* at *4.

On the other hand, in *In re Farmers Ins. Exch. Claims Reps' Overtime Pay Litigation*, No. MDL 33-1439(B), 2005 WL 1972565 (D. Or. Aug. 15, 2005), the court did distinguish between paying overtime and crediting it for ERISA purposes, holding that the latter was a fiduciary function.  *Id.* at *4-5.  The court in *Rosenburg v. IBM*, No. C 06-0430, 2006 WL

1627108, at *5 (N.D. Cal. June 12, 2006) held "that whether IBM was wearing its employer or its plan administrator 'hat'" in failing to credit overtime worked by employees allegedly misclassified as exempt "is at least in part a factual issue," thus precluding 12(b)(6) dismissal. Additionally, the District of Arizona recently found that "[u]nder ERISA, crediting hours is a fiduciary function, independent of the payment of wages." *Stickle v. SCIWestern Market Support Ctr., L.P.*, No. CV 08-083-PHX, 2008 WL 4446539 (D. Ariz. Sept. 20, 2008).

Although these precedents appear to be discordant, the Court reads them as reflecting a general if not unanimous consensus to accept the theoretical distinction between the non-fiduciary act of deciding whether and how much to pay an employee for certain hours worked, and the fiduciary role of deciding whether to credit an employee's retirement plan. Although it is often convenient for employers to calculate retirement plan benefits based on compensation actually paid, ERISA does not require them to do so. *See* 29 U.S.C. § 1002(2)(A). Thus, an employer *could* adopt a plan that explicitly measures ERISA contributions or benefits based on wages that should be paid (or total number of hours worked) rather than wages that are paid, in which case the distinction between payment of wages and crediting of hours would unquestionably be relevant.

The question, then, is how this analysis changes when a plan provides that contributions or benefits shall be calculated based only on actual compensation paid. The Court reads *Steavens*, *Lepage*, and *Maranda* as concluding that under such a provision, the fiduciary has no duty to credit an employee's account to reflect compensation that was earned, but never paid, and the Court agrees with this conclusion. Although there are other laws that govern whether and how much employers must pay their employees, for ERISA

12

purposes, those payment decisions are not fiduciary actions.[2] Instead, they are more like everyday business decisions that, although the decisions may have an effect on plan benefits, are not governed by ERISA duties.

In this case, although the plan documents are referred to throughout the Complaint, they do not appear in the record. Thus, the Court is unable to determine at this stage of the proceeding whether the payment/crediting distinction relied on by the plaintiffs is applicable to their situation. The Complaint does state that "employees' rights to share in the contributions to the Plan are dependent, in part, on their Eligible Compensation," but it does not explain whether this means compensation earned or only compensation actually paid. As a result, for the time being the Court will not dismiss plaintiffs' second claim for relief on this basis. Should the plan at issue here turn out to peg its benefits only to compensation actually paid, the defendants may submit a copy in evidence and once again move for dismissal or summary judgment.[3]

### b. Scienter Requirement

The defendants also briefly argue that only intentional misconduct can amount to a breach of an ERISA duty, and that plaintiffs have failed to plead facts in support of such a

---

[2] As noted, a plan could provide that contributions or benefits would be calculated based on hours worked, or wages earned regardless of whether actually paid. Even then, however, paying the wage itself would still not be a fiduciary function.

[3] If those are indeed the terms of the plan, and the plaintiffs desire to expedite the pretrial process in this case, they are encouraged to voluntarily dismiss their second claim for relief.

state of mind here. The Court regards this requirement of intentionality as a questionable legal proposition. ERISA's duty of care, in particular, would mean very little if it could only be violated intentionally. Even the duty of loyalty could surely be breached through knowing or reckless misconduct. The issue is not relevant here, in any case, because the defendants' argument is again based on a misconception of the level of detailed required in the complaint. Plaintiffs have pleaded that "as a means of reducing their labor costs, Defendants' policies and compensation plan were designed to prevent or minimize the wages, overtime compensation, and other monies required to be paid or credited to its employees." Compl. ¶ 20. In the Court's view, this is close to a specific allegation of intent. At the least, even if a relatively high level of scienter is required for an employer to breach its ERISA duties, this allegation satisfies the notice-pleading requirement that plaintiffs explain the grounds for their claim.

IV. Count Three: FLSA Claim

The Fair Labor Standards Act provides that employees who work more than 40 hours in a given work week must, for those excess hours, be paid at least "one and one-half times the regular rate" they receive. 29 U.S.C. § 207(a)(1). In a later section, however, the FLSA exempts employers from this requirement with respect to "any employee employed in a bona fide executive, administrative, or professional capacity." *Id.* at § 213(a)(1). As noted above, a major portion of the plaintiffs' claim in this case is that ALC improperly classified some of them as exempt from overtime on these grounds, and simply refused to pay for the overtime that others of them worked.

ALC claims that the complaint includes no facts supporting the plaintiffs' contention that they were in fact non-exempt. After reading the complaint, the Court finds the

argument to be without merit.  By way of example, the plaintiffs have alleged that many of them

> devoted the majority of their work time to non-management functions, *i.e.,* selling ALC cosmetic skin treatments and products, which was their primary duty. [They] did not direct the work of two or more full-time employees; did not have the authority to hire and fire or make recommendations regarding [such matters]; and/or did not regularly exercise a high degree of independent judgment in their work.  Indeed, Manager Class members were themselves closely supervised by members of the ALC corporate office, literally being told what to say and do. . . . [Most of them] were recruited from department store cosmetic sales counters with no managerial experience or training, neither of which was [sic] supplied or required by ALC. . . . Defendants . . . monitored and had instantaneous access to each clinic's daily appointments and sales.  In fact, most if not all of the Manager Class members' sales appointments were scheduled directly by ALC out of its corporate headquarters, and Manager Class members had to make daily reports to corporate as to whether they had met their sales quotas and, if not, why not.

Compl. ¶ 18.  Defendants offer no authority, and the Court has found none, that renders these allegations inadequate to support a claim of non-exemption.  At any rate, the plaintiffs also note that "the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof."  *Corning Glass Works v. Brennan*, 417 U.S. 196-97 (1974).  Accordingly, the allegations of the plaintiffs on these issues are sufficient to survive a motion pursuant to Rule 12(b)(6).

ALC also objects that the Complaint includes insufficient detail, for the purposes of FLSA,  as to when the plaintiffs worked overtime, how much they worked, and how much they should have been paid for it.  As authority for dismissal on this ground, the defendants rely on *Anderson v. Mt. Clemens Pottery Co.*,  328 U.S. 680, (1946).  This case indeed establishes that an employee claiming nonpayment of overtime bears the burden of proving in some fashion the amount owed by the employer.  *Id.* at 687.  But in reaching that

conclusion, the Supreme Court expressly contemplated that the employee would be able to access the relevant evidence in discovery before having to make such a showing: "[w]hen the employer has kept proper and accurate records the employee may easily discharge his burden by securing the production of those records." *Id.* It is only "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes" that the employee must "prove[] that he has in fact performed work for which he was improperly compensated." *Id.* In such circumstances, a plaintiff must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687.

*Mt. Clemens,* therefore, does not require an employee to *plead* any specific number or estimate of overtime hours worked. Indeed, doing so would have run directly contrary to the Court's concern that "[d]ue regard must be given to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records . . . and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* When an employer fails to keep proper records, even after trial it "cannot be heard to complain that the damages lack the exactness and precision of measures that would be possible" if it had done so. *Id.* at 688.

As a result, the Sixth Circuit has not required FLSA plaintiffs to provide an extreme level of detail as to when and for how long they performed uncompensated work. In *U.S. Dept. Of Labor v. Cole Ents., Inc.*, 62 F. 3d 775, 779 (6th Cir. 1995), "[v]arious employees [of a restaurant] . . . testified that they performed both pre-shift and post-shift work, which included such tasks as setting up the dining room, preparing coffee and tea, filling condiment containers, setting out side dishes and desserts, cleaning tables and

countertops, finishing serving customers, and putting away equipment." The Sixth Circuit found this evidence, as compiled through interviews and trial testimony by a Department of Labor investigator and supplemented by the employer's records, sufficient to support an award of back wages. *Id.* at 780.

This Sixth Circuit's summary of the testimony in *Cole* is analogous to the allegations of the complaint in this case. Beyond alleging that the plaintiffs worked "in excess of 40 hours per week without receiving overtime compensation," Compl. ¶¶ 35, 39-44, the complaint states that some of the plaintiffs spent a portion of these hours "work[ing] through unpaid lunch periods to perform various tasks including, but not limited to, 'prepping' the treatment room for that day's or the next day's scheduled appointments, completing paperwork and client charting or e-charting, finishing up client procedures, and waiting for late-arriving clients . . . . Furthermore, client laser and cosmetic procedures were scheduled right on top of one another . . . necessitating or exacerbating such off-the-clock work." *Id.* ¶ 19. For other employees, some of these excess hours were spent traveling, training, and at "'mandatory' dinners with ALC corporate officers and 'VIPs'." *Id.* ¶ 23. Combined with the plaintiffs' allegations that defendants have not kept records of the overtime they actually worked, these averments state a claim under the *Mt. Clemens* standard, and dismissal is not appropriate on this ground.

\*　　\*　　\*

The defendants make arguments similar to the foregoing with respect to the plaintiffs' claims that ALC failed to pay them the overtime required under the laws of their states of residence, and plaintiffs' claims that by not paying them at all for some of their hours, ALC failed to pay the minimum wages mandated by state law. The Court will deny the motion

based on these arguments for the same reasons as those stated above; the plaintiffs have amply stated the basis on which their state overtime and hourly claims rest.

V.  State Unlawful-Withholding Claims

The plaintiffs assert that by withholding or deducting wages from the paychecks, ALC has violated various state law provisions, and ALC objects once again that this claim is not pleaded with sufficient particularity.  Specifically, ALC asserts that the plaintiffs fail to "put the Court and Defendants on notice as to the reasons for the purported deductions so that these claims may properly be evaluated."  Def. brief, docket no. 6, at 11.  A plaintiff is not required to  anticipate and refute in a complaint any and all innocent explanations that a defendant might offer for its allegedly wrongful conduct.  The defendants will have a sufficient opportunity to explain the deductions as litigation proceeds, and for the moment, the defendants are on notice that plaintiffs believe they were wrongful.

The defendants also object that the plaintiffs do not plead the amount or frequency of these deductions, or which of the named plaintiffs were subjected to them.  But plaintiffs have made material allegations in both regards.  In ¶ 21, the Complaint states that "[e]ffective January 1, 2007, Defendants began deducting $500 per month from the wages of the Manager Class members for unspecified 'Accounting errors,' 'Human Resources Errors,' and the failure to 'Make Labor target' (i.e., zero recorded overtime)."  This addresses not only the questions of "who," "when, " and "how much" with respect to the deductions, but also explains why (at least purportedly) they were made.

VI.  Illinois Meal-Period Claim

One of the named plaintiffs, purportedly on behalf of a class of Illinois employees of ALC, alleges that "[a]t all relevant times, Defendant failed to provide . . . at least one 20-

minute meal period on every workday of at least 7½ hours, beginning no later than 5 hours after the start of work, in violation of the Illinois Wage Laws." Compl. ¶ 150. "All relevant times" apparently refers to the Illinois class period, which runs from July 16, 2004 "through the date of the final disposition of this action." Compl. ¶ 12.

ALC asserts, plausibly, that this does not put it on notice of what is being claimed. Read liberally, however, the complaint alleges that as a result of being required to work through lunch, each Illinois class member was deprived of a meal break on one or more workdays during this period. This allegation is sufficient to state a claim. At this point in the litigation, the plaintiff need not, as defendants request, establish or approximate the number of days she was deprived of a break or identify a specific amount of the penalties suffered.

## VII. State-Law Claims: Failure to Pay on Separation

The plaintiffs claim that by not paying "all wages and compensation due and owing to [them], including accrued vacation time," upon the end of their employment with ALC, defendants violated the laws of various states. Defendants complain that plaintiffs have not identified "what wages and or [sic] compensation were allegedly owed to them," described "the nature of the work they performed [and] their rate of pay," or claimed a specific number of unpaid vacation days. Def. brief, docket no. 6, at pp. 12-13. But the Court finds that most of the rest of the complaint is a series of claims for unpaid wages and compensation. The plaintiffs have also described the work they did for defendants, *e.g.,* Compl. ¶¶ 19, 23, and cannot be expected in their complaint to correlate their unpaid wages to specific duties performed or time spent on the job. Nor it is apparent why the plaintiffs' rate of pay or a specific number of unpaid vacation days need to be identified in

order to raise the claim for relief above the speculative level or provide adequate notice to defendant of what is being claimed. The Court will not dismiss these claims on this ground.[4]

VIII. State Conversion Claims

In Count Eight the plaintiffs, after dividing themselves into separate classes based on their states of employment, allege that ALC's actions amounted to a conversion of their money under the common laws of Arizona, Illinois, Pennsylvania, and Utah. ALC attacks the sufficiency of this allegation on two grounds. First, it argues that conversion is an intentional tort in each of those states, but that plaintiffs have failed to allege facts supporting a finding that ALC's wrongdoing was intentional. This argument echoes the defendants' other demands for a higher level of detail in the complaint; but the plaintiffs have alleged that defendants' plans and policies were "designed" to accomplish the wrongs of which they complain, Compl. ¶ 20, that ALC in fact deducted money directly from their wages, Compl. ¶ 21, that ALC's refusal to pay monies owed was "willful," *id.* ¶ 31, and that it was done "knowingly and intentionally," *id.* ¶ 184. These allegations are all that is required.

Defendants' second line of attack on the conversion claim, however, is more meritorious. Specifically, the defendants argue that under the law of each relevant state,

---

[4] ALC lodges one more specific objection, as well: namely, that Pennsylvania law does not require payment for accrued vacation time. In support of this proposition, they cite to *Doe v. Kohn, Nast & Graf, P.C.*, 862 F. Supp. 1310, 1325-26. That case does recognize that Pennsylvania's Wage Payment and Collection Law is only a vehicle for enforcing contractual rights that an employee already has. The complaint here, however, states only that plaintiffs did not receive payment on separation for accrued vacation, without specifying whether payment was due under the contract itself. Since it can fairly be read as a claim on the contract, dismissal is not warranted.

money can be the subject of conversion only if it amounts to a "specific identifiable sum," and that the complaint does not allege that any such sum exists. Evaluating this argument requires a consideration of the law of each of the four states.

A. Arizona

Arizona's rule "is that money can be the subject of a conversion provided that it can be described, identified or segregated, and an obligation to treat it in a specific manner is established." *Autoville, Inc. v. Friedman*, 20 Ariz. App. 89, 91(citations omitted). By contrast, "conversion does not lie to enforce the mere obligation to pay a debt which may be discharged by the payment of money generally." *Id.* at 92 (citation omitted). Thus, in *Autoville*, when a car dealership failed to pay the agreed portion of its sales to the man who financed its purchase of the cars, the court held that no claim for conversion had been pleaded even though the financier may have been able to identify a specific sum owed to him. *Id.* Similarly, in *Stokes v. Stokes*, 143 Ariz. App. 590, 594 (1984), the court held that no claim for conversion would lie because a "husband's failure to pay to the wife one-half the amount of his monthly check created a debt which could have been discharged by payment of money generally."

Here, the plaintiffs plead no facts tending to describe, identify, or segregate the funds to which they claim entitlement. As such, their suit is for "the payment of money generally," *Autoville*, 20 Ariz. App. at 92, and will not support a claim for conversion.

B. Illinois

The seminal case on the issue in Illinois is *In re Thebus*, 108 Ill. 2d 255 (1985), a case in which an attorney failed to pay to the tax authorities funds he had withheld from his employees' paychecks for that purpose. The Illinois Supreme Court noted that "[m]oney

may be the subject of conversion, but it must be capable of being described as a specific chattel, although it is not necessary for purposes of identification that money should be specifically earmarked. However, an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money." *Id.* at 260. The amount of money converted may be pleaded in dollars and cents, but it must appear that it will be calculable in precise terms after discovery. *Roderick Development Investment Co. v. Comm'y Bank of Edgewater*, 282 Ill. App. 3d 1052, 1062 (1996).

In *Thebus*, "respondent held no identifiable sum of money or fund" for tax payments, and the allegedly converted sum "did not come into respondent's hands from any outside source," but rather "accrued with each pay period as the respondent wrote the payroll checks from his general checking account for the net amount of wages after taxes, retaining in his checking account the difference between the gross wages and the amount of the check." *Thebus*, 108 Ill. 2d. at 263. As a result, "[a]lthough the respondent was under an obligation to remit to the Internal Revenue Service the amount of money withheld as taxes, this obligation is in the nature of a debt to the government," rather than a sum that he had converted. *Id.* at 262.

The Court finds the facts alleged here to be indistinguishable from those of *Thebus*. The plaintiffs have not pleaded that the monies they claim entitlement to have any characteristics that identify them as a specific or identifiable fund. Instead, as in *Thebus*, they simply accrued as defendants failed to add them to plaintiffs' paychecks, which could be drawn from any available funding source. Under these circumstances, plaintiffs have

alleged "a mere obligation to pay money," *Thebus*, 108 Ill. 2d at 260, on which a claim of conversion will not lie.[5]

## C. Pennsylvania and Utah

The law is somewhat less well developed on this topic in the remaining two states addressed by the complaint. In Pennsylvania, "[m]oney may be the subject of conversion," *Shonberger v. Oswell*, 365 Pa. Super. 481, 485 (1987), but a mere "failure to pay a debt is not conversion" unless debt can be said to be a unit of "property" rather than undifferentiated funds. *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A. 2d 875, 878 (Pa. Super. 1997). As noted, the funds at issue in this case have none of the characteristics of "property;" if this does not qualify as a mere "failure to pay a debt" under Pennsylvania law, then it is difficult to think of anything that would. Accordingly, the Court concludes that the plaintiffs have not pleaded a Pennsylvania conversion claim.

Utah apparently adopts an even more restrictive test than other states: the Court has found no case permitting money to be the subject of conversion except "when the party charged wrongfully received it." *State v. Twitchell*, 832 P. 2d 866, 870 (Utah App. 1992). The plaintiffs have pleaded no such thing here, and thus, their complaint states no Utah conversion claim.

## D. Conclusion– Conversion Claims

---

[5] The *Thebus* court did note that "there has been no conversion of employees' funds," and appeared to predicate this on the legal rule that the withholding itself satisfied the employees' tax obligations, regardless of whether their employer ever actually forwarded the money to the authorities. *Id.* at 261. This Court, however, regards the *Thebus* court's separate observations about the lack of any identifiable sum or fund to be an independent basis for a finding of no conversion. That is to say, even where, as here, an employer *has* been alleged to have taken money to which its employees are entitled, this will not amount to conversion unless the claim is also for payment of an identifiable sum or fund.

The laws of each of the states cited in the plaintiffs' complaint require a more discrete fund of money than plaintiffs allege here in order to permit an action for conversion. As a result, the plaintiffs' Eighth Claim for Relief will be dismissed for failure to state a claim on which relief can be granted.

## IX.  Count Nine: Unjust Enrichment

Finally, plaintiffs claim entitlement to recover on many of the facts listed above on a theory of unjust enrichment. In response, defendants reprise their arguments as to the lack of detail with which the plaintiffs have pleaded their work activities. The Court rejects this position based on those arguments for the reasons given above.

ALC additionally argues that because the plaintiffs have available all the legal remedies enumerated in their first eight counts, an equitable claim such as unjust enrichment should be dismissed. The Court agrees that to the extent that any of the plaintiffs recover on the first eight claims, they will be precluded from recovering in unjust enrichment for the same actions of the defendants. This case, however, is still in the pleading rather than the remedial stage, and at this point "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Dismissal of the unjust enrichment claim is not warranted.

## X.  Attorneys' Fees

The plaintiffs from Illinois and Utah seek attorneys' fees and litigation costs under statutes of those respective states. ALC moves to dismiss on the grounds that those statutes require that a written demand for payment from the defendant before filing suit, and plaintiffs have failed to plead that they made such a demand.

There is indeed a section of Illinois law providing that an employee who wins a judgment for "wages earned and due and owing" may recover attorneys' fees and the costs of the action if the employee can also show "that a demand was made in writing at least 3 days before the action was brought, for a sum not exceeding the amount so found due and owing." 705 Ill. Comp. Stat. Ann. § 225/1. The Utah Code contains nearly identical language, but substitutes a fifteen-day notice period. Utah Code Ann. § 34-27-1. Both of these sections require a court to make an award of fees if the plaintiff prevails.

The Complaint, however, requests attorneys' fees under different statutory provisions, 820 Ill. Comp. Stat. Ann. § 105/12(a) and Utah Code Ann. § 34-40-205.[6] Compl. ¶¶ 156, 181. Unlike the statutory sections invoked by ALC, these provisions make an award of fees and costs discretionary with the Court. Importantly, neither of them includes any sort of notice requirement. Therefore, the Court will not dismiss the claims for this type of relief.

XI. Claims Against Defendant Morgan

The defendant Richard Morgan moves to dismiss each of the counts insofar as they assert a claim for relief against him personally. The plaintiffs claim that ALC Partner, Inc. was no more than an alter ego of Morgan, and thus, that Morgan should be personally responsible for its wrongdoing. The Court will consider the details of each side's contentions separately, with regard to the plaintiffs' FLSA and ERISA claims.

---

[6] In their brief in response to this motion, plaintiffs have argued that they are also entitled to fees and costs under 705 Ill. Comp. Stat. Ann. § 225/1 and Utah Code Ann. § 34-27-1, because they did in fact serve notice on defendants as required by those statutes. The Court is skeptical that the notice provided is sufficient as a matter of law– plaintiffs claim that by bringing an earlier suit in California and then voluntarily dismissing it, they gave the required notice– but in any event, the plaintiffs have not pleaded that they gave any such notice. As a result, their complaint does not state claim for fees under these sections.

A.  FLSA Claim

Sixth Circuit precedent is clear that a person who owns or controls a business entity can be liable for its FLSA infractions.  The FLSA defines an "employer" to "include[] any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  "Whether a party is an employer within the meaning of the FLSA is a legal determination," *Dole v. Elliott Travel & Tours, Inc.*, 942 F. 2d 962, 965 (6th Cir. 1991) (citation omitted), and "'[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'" *Id.* (quoting *Donovan v. Agnew*, 712 F. 2d 1509, 1511 (1st Cir. 1983)).

In *Dole*, one of the defendants "was the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries."  *Id.* at 966. The Court concluded that this sufficed to impose FLSA liability: "it is not required that a party have exclusive control of a corporation's day-to-day functions.  The party need only have 'operational control of *significant aspects* of the corporation's day to day functions." *Id.*  (Internal quotation marks and citation omitted).  Defendant was the "'top man' . . . and the corporation functioned for his profit," so he was an employer.  *Id.; see also Fegley v. Higgins*, 19 F. 3d 1126, 1131 (6th Cir. 1994) (under FLSA, CEO of business was "employer" where he held a significant interest in the business, controlled significant functions thereof, determined salaries and made hiring decisions); *U.S. Dept. Of Labor v. Cole Ents., Inc.*, 62 F. 3d 775, 778 (1995) (president and vice president of corporation was FLSA "employer" when he "had operational control" over business).

In this case, the complaint states that until its sale at the end of 2007, Morgan was "the President, CEO, and the controlling force of American Laser Centers," as well as its "cult-like figurehead . . . who bullied, intimidated, and dominated his subordinates into doing what he wanted." Complaint ¶ 48. It further alleges that "Morgan exercised direct or indirect control over all operational decisions and policies (including those relating to wages, hours, classifications, and working conditions of employees) at each and every American Laser Centers clinic where the practices described herein were and are performed." *Id.* Specifically, "Morgan created, structured, and maintained American Laser Centers in order to avoid paying overtime, thereby maximizing his profits and earnings." The Court concludes that these allegations sufficiently plead defendant Morgan's potential FLSA liability.

B. ERISA Claims

Although ERISA's definition of "employer" is facially similar to the FLSA's, the courts, including the Sixth Circuit, have interpreted it differently. ERISA states that for its purposes, "[t]he term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan . . . ." 29 U.S.C. § 1002(5). In *Scarbrough v. Perez*, 870 F. 2d 1079, 1082-83 (6th Cir. 1989), the Sixth Circuit rejected "[t]he argument that ERISA ought to be given the same sort of broad interpretation as the Fair Labor Standards Act" with respect to who qualifies as an 'employer.' Instead, the court held that "where a court is without justification for piercing the veil separating a corporate employer from its owner-chief executive, the owner-executive may not be held personally answerable for the corporation's delinquent

contributions." *Id.* at 1083. Likewise, in *Flynn v. Greg Anthony Construction Co., Inc.*, 95 Fed. Appx 726 (6th Cir. 2003), the court reiterated that:

> [c]orporate officers and shareholders do not fall within ERISA's definition of 'employer,' and thus cannot be held personally liable for a corporation's ERISA obligations by virtue of their relationship to the corporate employer alone. . . . . However . . . once corporate liability is established under ERISA, shareholders and officers may be held personally liable for their corporations' obligations under ERISA if they have acted as the 'alter egos' of their corporations or otherwise met the requirements that justify 'piercing the corporate veil' under traditional common law principles.

*Id.* at 733 (citations and quotation marks omitted); *see also McDowell v. Krawchison*, 125 F. 3d 954, 961-62 (6th Cir. 1997) (concluding that ERISA's definition of "employer" was intended "to impose *respondeat superior* liability on employers, not to hold those acting on behalf of employers personally liable"); *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F. 2d 702, 704-05 (6th Cir. 1988) (piercing the corporate veil in order to impose individual ERISA liability).

Although they are sufficient to state an FLSA claim, plaintiffs' allegations with regard to Morgan's control of the business-entity defendants are inadequate to justify piercing the corporate veil. It seems likely that plaintiffs were cognizant of this, as they add that "there exists such a unity of interest and commonality of control, including commingling of funds, lack of adequate capitalization, failure to maintain proper books and records, and additional omissions, that there truly is no separation or distinction between and among Defendants." Compl. ¶ 53. With that, plaintiffs request that "adherence to the fiction of a separate business entity should be ignored and the persons and entities treated as though they were one and the same." *Id.*

The Court views this type of allegation as the conclusory pleading forbidden by *Bell Atlantic*. The breadth of the legal labels pleaded by plaintiffs, such as "commingling of funds" and "lack of adequate capitalization," as well as their appearance in a sort of laundry list of allegations without any supporting facts, fail to raise the claim above the level of speculation. Accordingly, the Court will dismiss the ERISA claims against Morgan, with leave to amend to correct the deficiencies found by the Court.

D. State-Law Claims

Finally, defendant Morgan assails the plaintiffs' claims of unjust enrichment and their other claims under state law. With respect to the unjust enrichment claim, he argues that the complaint does not plead that he personally was enriched or personally participated in tortious conduct, and thus cannot support such a claim. In light of the allegations of Morgan's position in the company and control over its activities, the Court is not convinced that the complaint fails to address these issues as utterly as Morgan says. In any event, Morgan does not cite to any case or statute in support of his assertions that any of the state law claims against him personally are not viable; indeed he fails to offer any discussion of any of the claims other than the one for unjust enrichment. If Morgan indeed feels that dismissal is warranted on these counts, he may move for summary judgment and submit briefing on those issues. Until he does so, the Court will not dismiss the state law claims against defendant Morgan.

**ORDER**

**WHEREFORE**, it is hereby **ORDERED** that defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, and that:

Plaintiffs' first and second claims for relief for ERISA violations are dismissed insofar as they seek relief from Richard Morgan, with leave to amend within 20 days;

Plaintiffs' eighth claim for relief (conversion) is dismissed in its entirety, with leave to amend within 20 days.

**SO ORDERED.**

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated:  December 9, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 9, 2008, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager